**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT MAJERNIK, *on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>vs.<br><br>EQUITABLE FINANCIAL LIFE INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 26 Civ. 04874 (RA)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Majernik ("Plaintiff"), on behalf of himself and all others similarly situated, for his Amended Class Action Complaint against defendant Equitable Financial Life Insurance Company ("Equitable," "Defendant," f/k/a AXA Equitable Life Insurance Company or "AXA"), states as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiff and similarly situated owners of certain universal life insurance policies insured by Equitable. Plaintiff seeks to represent a class of policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges imposed by Equitable.

2. Universal life policies are variable rate contracts. Unlike term or whole life policies, whose premiums are generally fixed and disclosed in advance, universal life policies have separate policy charges that are determined on an ongoing, prospective basis using then-current assumptions. Indeed, many insurers refer to such products as "CAUL"—which stands for "Current

Assumption Universal Life." The charges and rates are variable and are required to be determined according to the factors set forth in the policy.

3. Where permitted or required by the policy language, insurers determine COI rates considering their expectations of future corporate taxes. Prior to 2017, most U.S.-based insurers used a 35% federal income tax assumption when pricing their universal life products, mirroring the then-prevailing federal corporate income tax rate.

4. In late 2017, however, Congress passed the Tax Cuts and Jobs Act ("TCJA"), which, among other things, reduced the corporate income tax rate from 35% to 21%. This was a boon for life insurance companies like Equitable. On a Q1 2018 earnings call, CEO Mark Pearson told analysts that Equitable estimates "the benefit of corporate tax reform to be circa **150 million per annum**. And going forward, we estimate our effective tax rate will be approximately 19%."[1] On the Q4 2018 earnings call, management again attributed earnings improvements to the TCJA, noting the company's operating earnings increased 28% in the prior period, even excluding favorable actuarial assumption updates.[2] Chief Financial Officer Anders Malmstrom explained that "[l]ower income tax expense is driven by the impact of tax reform and higher net investment income."[3] And Equitable's SEC filings stated that it expects the TCJA to have a "net positive economic impact" for it, and that its post-TCJA effective tax rate is expected to be approximately 19%, driven mainly by the new federal corporate tax rate.[4]

---

[1] https://discountingcashflows.com/company/EQH/transcripts/2018/1/
[2] https://www.nasdaq.com/articles/axa-equitable-holdings-inc-eqh-q4-2018-earnings-conference-call-transcript-2019-03-01
[3] *Id.*
[4] https://www.sec.gov/Archives/edgar/data/727920/000072792018000009/axaeq-03312018x1q1810q.htm

5. The Society of Actuaries ("SOA") has incorporated the tax change in its industry publications. For example, in its 2021 update to its Life Pandemic Model: U.S. Life Insurance Industry Moderate Scenario, the SOA changed the assumed tax rate from 35% to 21%.[5]

6. The passage of the TCJA should have led to a significant reduction in COI deductions and rates for Equitable's universal life policies. Under a 35% tax rate, an insurer like Equitable would have to earn pre-tax profits of roughly $153.8 million to realize an after-tax profit of $100 million. With a 21% tax rate (even leaving aside that Equitable says 19% is its effective tax rate post-TCJA), Equitable needs to generate only $126.6 million in pre-tax profits to produce the same $100 million in after-tax profits. This change alone would indicate that, following the enactment of the TCJA, Equitable should have reduced COI deductions and rates. Equitable, however, has not reduced COI deductions and rates following the passage of the TCJA; instead Equitable has continued to increase and otherwise change COI deductions and rates while ignoring completely the material improvement in its corporate tax rate.

7. This violates the terms of Plaintiff's contract with Equitable, which states that: "The monthly cost of insurance is our current monthly 'cost of insurance rate' times the 'net amount at risk'"; "We will determine cost of insurance rates from time to time"; and "Changes in policy cost factors (interest, cost of insurance deductions and expense charges) will be by class and based upon changes in future expectations for such elements as: investment earnings, mortality, persistency, expenses and taxes." This also violates other terms of Plaintiff's contract with Equitable, which require that Equitable will "review" COI rates "at least every five years and at the time any change is made for new issues," and "*[a]ny* adjustment" in COI rates "will be by class and based upon changes in future expectations for such elements as investment earnings, mortality,

[5] https://www.soa.org/globalassets/assets/files/resources/research-report/2021/2021-life-pandemic-model.pdf

persistency, expenses and taxes." (emphasis added; text of endorsement is in all capital letters in policy).

8. This language means that if Equitable's future expectations of federal income tax (or other enumerated factors) improve, then when Equitable reviews the rates, it should change the rates to reflect the changed future expectations. It also means that when Equitable changes the COI deductions charged or adjusts the COI rates, then those changes and adjustments must reflect, and cannot ignore, that improvement. That obligation applies regardless of whether Equitable claims that some internal, undisclosed COI rate "scale" has stayed the same, because the policy speaks to changes in "cost of insurance deductions," not to changes in any scale.

9. Equitable has violated the terms of its policies because the future expectations listed above have changed, including in the last five years, but the current cost of insurance rates and deductions are not based on those changed assumptions. Further, the COI deductions and rates imposed on Plaintiff have changed and adjusted each year, through increases, but those changes and adjustments have not been based on changes in future expectations for such elements as mortality and taxes; in fact, Equitable has ignored completely the favorable changes to those expectations. As a result, Equitable is keeping for itself hundreds of millions in projected windfall profits that it was required to pass along to policyholders via reduced rates and charges.

10. Equitable's own regulatory filings confirm that it determines the non-guaranteed elements it charges policyholders, including COI deductions, each year. For example, in its 2024 filing, dated February 28, 2025, Brian Lessing, an Actuary and Signatory Officer, certified that he had "examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance policies of the company used for delivery in the United States." He certified that the non-guaranteed elements he examined included those "[p]aid,

credited, charged or determined in 2024," and that "[i]n my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements . . . ." Equitable thus certified to regulators that the nonguaranteed elements it charged in 2024 were "determined in 2024," including the COI deductions taken from Plaintiff's policy account. It also states, "Assumptions underlying non-guaranteed elements are monitored and changes to non-guaranteed elements will be made as warranted," and Equitable's "[c]urrent policy and/or general methods and procedures for determining values of nonguaranteed elements on new or existing business are consistent with generally accepted methods of reflecting investment, mortality, persistency, and expense experience." But contrary to its own certification, while Equitable claims to annually "monitor" the assumptions underlying its non-guaranteed elements, and to make changes to those elements "as warranted," Equitable has not "reflect[ed]" its improved mortality and tax expectations in the cost of insurance rates and deductions that Equitable determines and charges each year.

11. Equitable's conduct is particularly galling given that life insurers have not hesitated to ***increase*** COI rates when their expectations deteriorate in an adverse way. For example, in 1990, Congress passed the Revenue Reconciliation Act of 1990, which changed how insurers, for federal income tax purposes, amortized expenses associated with acquiring new business, and resulted in what insurance companies claimed was an increase in insurer tax obligations.[6] Many insurers responded by increasing COI charges to pass along the increased tax obligations to policyholders. And Equitable itself imposed massive COI increases on certain UL policyholders in 2016 due to

[6] These changes are often referred to as the "DAC Tax," or "DAC Tax Reform." "DAC" stands for "deferred acquisition costs."

claimed deterioration in its expectations, claims related to which Equitable settled for $307,500,000 in cash and additional non-cash relief in May 2023. *Brach Family Foundation, Inc. et al. v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 740 (JMF) (S.D.N.Y.).

12. Yet now that tax rates have dramatically improved, Equitable has pretended as if its expectations have not changed at all—while simultaneously telling its stakeholders how much more money it has made and will continue to make from lower tax rates.

13. Worse still, Equitable's future expectations of mortality have also improved since these products were issued, as detailed further below. And yet, Equitable has not revised its COI deductions or rates to reflect this mortality improvement either; to the contrary, Equitable ignored these changes in future expectations for mortality in setting its COI deductions and rates.

14. It is apparent that Equitable wrongly construes its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to ***increase*** COI deductions, rates and charges in response to adverse changes in its tax and mortality expectations, but not requiring it to ***decrease*** COI deductions, rates, and charges in the face of an unambiguous and far more dramatic reduction in future expectations of mortality and taxes. This interpretation is contrary to the plain language of the policies. As a result of Equitable's breaches, Plaintiff seeks monetary relief for the COI overcharges Equitable has wrongly imposed on Plaintiff and all of its similarly situated customers who each own a policy with the same or materially similar language at issue here.

## THE PARTIES

15. Plaintiff Robert Majernik is an individual who is domiciled in Yonkers, New York, and is a citizen of New York. Majernik owns a universal life policy issued by Equitable's predecessor on November 7, 1985, as policy number 35205206 (the "Majernik Policy").

16. Equitable Financial Life Insurance Company is a corporation organized under the laws of New York and has its principal place of business at 1345 Avenue of the Americas, 3rd Floor, New York, New York 10105. Equitable issues universal life policies throughout the United States.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant, and the aggregate amount of damages exceeds $5,000,000. Equitable is incorporated in New York and has its principal office in New York, while absent class members are citizens of states across the United States and not just New York. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

18. This Court has personal jurisdiction over Equitable because it is a citizen and resident of this State and issues policies in this State, including policies within the class asserted in this action.

19. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)–(d) because Equitable resides in this District and a substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### A. The COI Overcharge Class Policies at Issue

20. The policies at issue in this case are all flexible-premium, universal life or variable universal life policies (collectively, "UL" policies) issued by Equitable or its predecessors-in-interest stating that changes in COI deductions or COI rates will be based upon changes in future expectations for such elements as "mortality" and "taxes." These policies are referred to as "COI

Overcharge Class Policies." The COI Overcharge Class Policies are all form policies, and owners cannot negotiate different terms. The COI Overcharge Class Policies are all contracts of adhesion.

21. UL policies offer both a death benefit and a savings or investment component, often known as the "policy account," "account value," or "policy value." One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in force. Unlike whole life and term life insurance that require fixed monthly premium payments, UL policies only require that premiums be sufficient to cover the COI charges and certain other specified expenses. The COI charge, which is by far the largest charge imposed, is deducted from the policy account (i.e., the savings component) of the policy every month, so the policyholder forfeits the COI deduction entirely to Equitable. Any premiums paid in excess of COI deductions and other charges are applied to the policy account. These excess premiums earn interest. This structure is beneficial because it allows policyholders to set the savings level within the policy and earn a return on those savings.

22. The size of the COI deductions and COI rates is highly material to UL policyholders. First, they dictate the minimum that policyholders must pay or earn through interest on the policy account to keep a policy in force. Second, high COI deductions and rates can quickly diminish the policy account and thereby reduce the principal on which interest can be earned. Third, the net amount at risk, defined as the "Death Benefit minus the amount in the Policy Account," will increase as a result of the diminished policy account, which in turn leads to a higher monthly cost of insurance deduction since that amount is calculated as the COI rate multiplied by the net amount at risk. As a general matter, if the policy account diminishes such that COI charges and certain other specified expenses can no longer be deducted, then the policy will go into grace

and, if the policyholder pays no additional premiums after adequate time provided by an accurate grace notice, the policy may lapse.

23. Because COI rates are variable rates and COI deductions are variable charges, universal life policies almost always have contractual provisions that dictate the manner in which COI charges will be determined over the life of the policy. The Majernik Policy contains the following provisions:

> The monthly cost of insurance is our current monthly "cost of insurance rate" times the "net amount at risk" (Death Benefit minus the amount in the Policy Account) at the beginning of the policy month; *plus* any extra charge shown in the Policy Information section times the Face Amount of Insurance at the beginning of the policy month. For this purpose the amount in the Policy Account is determined before the monthly cost of insurance deduction but after all other deductions due on that date have been made. The cost of insurance rate is based on the sex, attained age, and rating class of the insured person. ("Attained age" means age on the birthday nearest to the beginning of the then current policy year.)
>
> We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in "Changes in Policy Cost Factors" on Page 14. They will never be more than those shown in the Table of Guaranteed Maximum Insurance Costs on Page 4 plus any extra charge in the Policy Information section.
>
> * * *
>
> **Changes in Policy Cost Factors.** Changes in policy cost factors (interest, cost of insurance deductions and expense charges) will be by class and based upon changes in future expectations for such elements as: investment earnings, mortality, persistency, expenses and taxes. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

Majernik Policy at 9, 14.

24. The Majernik Policy also has the following endorsement (with the language appearing fully capitalized in the policy):

> WE WILL REVIEW THE POLICY ACCOUNT INTEREST RATES EACH POLICY YEAR AND WILL REVIEW THE COST OF INSURANCE RATES AT LEAST EVERY FIVE YEARS AND AT THE TIME ANY CHANGE IS MADE FOR NEW ISSUES. ANY ADJUSTMENT IN THESE RATES WILL BE BY

> CLASS AND BASED UPON CHANGES IN FUTURE EXPECTATIONS FOR SUCH ELEMENTS AS INVESTMENT EARNINGS, MORTALITY, PERSISTENCY, EXPENSES AND TAXES, AND WILL BE DETERMINED IN ACCORDANCE WITH PROCEDURES AND STANDARDS ON FILE WITH THE NEW YORK INSURANCE DEPARTMENT.

Majernik Policy at 3.

**B. Equitable Continues to Determine, Change, Adjust, and Impose COI Deductions and Rates that Are Not Based at All on its Dramatically Improved "Future Expectations for . . . Taxes."**

25. Insurers typically price their life insurance policies on an after-tax basis, meaning that—consistent with the wording of the contract—COI deductions and rates and other charges are calculated to generate a certain target level of after-tax profits. Equitable's predecessor priced the Majernik Policy and all other COI Overcharge Class Policies with the then-current corporate tax rate of 35%.

26. In 2018, the corporate tax rate was dramatically reduced to 21%. This was a boon for life insurers like Equitable, which estimated a $150 million annual windfall on a going forward basis. Other insurers adjusted their tax assumptions in similar fashion. Prudential, for example, recognized a $2.871 billion tax benefit in its Consolidated Statements of Operations for the year ended December 31, 2017. Protective Life recognized a provisional $797.6 million tax benefit in its consolidated statement of income for the year ended December 31, 2017.

27. Under the terms of the Majernik Policy, if Equitable's expectations of future taxes and mortality change for the better (that is, if it expects lower future tax obligations, or lower future mortality, than it previously assumed), then it must adjust COI deductions and rates accordingly when it reviews and determines those rates; likewise, when Equitable changes the COI deductions and rates, those changes must be based upon changes in future expectations for such elements as mortality and taxes. Equitable cannot simply ignore positive changes to its future expectations.

28. The Policy provides that "each policy year," Equitable will "send you a report" that shows, among other things, "all amounts added to or deducted from the Policy Account in the year," including "insurance cost deductions."

29. The annual statement for the Majernik Policy for the policy year ending October 7, 2020, shows, in the COST OF INSURANCE / INSURED PERSON column, monthly COI deductions of about $203 per month, with the amount varying in some months.

30. The annual statement for the policy year ending October 7, 2021, shows, in the COST OF INSURANCE / INSURED PERSON column, monthly COI deductions of about $230-$231 per month, with the amount varying slightly by month.

31. The annual statement for the policy year ending October 7, 2022, shows, in the COST OF INSURANCE / INSURED PERSON column, monthly COI deductions of about $255-$256 per month, with the amount varying slightly by month.

32. The annual statement for the policy year ending October 7, 2023, shows, in the COST OF INSURANCE / INSURED PERSON column, monthly COI deductions of about $279-$280 per month, with the amount varying slightly by month.

33. The annual statement for the policy year ending October 7, 2024, shows, in the COST OF INSURANCE / INSURED PERSON column, monthly COI deductions of about $303 per month, with the amount varying slightly by month.

34. The annual statement for the policy year ending October 7, 2025, shows, in the COST OF INSURANCE / INSURED PERSON column, monthly COI deductions of about $330 per month, with the amount varying slightly by month.

35. The annual statement for the policy year ending October 7, 2026, shows, in the COST OF INSURANCE / INSURED PERSON column, monthly COI deductions of about $369-$371 per month, with the amount varying slightly by month.

36. These monthly COI deductions, and COI rates, changed between each policy year. Those changes in COI deductions and rates are referred to as "[c]hanges in policy cost factors" and "adjustment in these rates" in the Majernik Policy, which are defined to include changes in "cost of insurance deductions" and "cost of insurance rates." Per the policy, each change in the COI deductions and rates was required to be "by class and based upon changes in future expectations for such elements as . . . mortality . . . and taxes." None of these changes reflected Equitable's improved tax and mortality expectations.

37. Equitable apparently intends to argue that these are not "changes" or "adjustment[s]" because, according to Equitable, it had some internal, undisclosed COI rate "scale," which Equitable claims has not changed. According to Equitable, by not changing this undisclosed COI rate "scale," Equitable can avoid entirely any obligation to reduce rates and charges to reflect its vastly improved expectations. There is no support for this contention in the policy language, which speaks to changes in "cost of insurance rates" and "cost of insurance deductions" and does not mention a COI rate "scale" anywhere. "Deductions," "rates," and "scales" (or "tables") are all different things.

38. Insurers know how to draft a policy that distinguishes between changes in COI rates or deductions, on one hand, and changes in a COI rate scale, on the other hand. For example, Nationwide policy form ICC21-NWLA-558 defines the "Current Scale of Non-Guaranteed Elements ('Current Scale')" as "[t]he Non-Guaranteed Elements that apply to the Policy in the then current and future Policy Years unless changed by us according to the Changes in Policy Cost

Factors section of the Policy." The policy further provides that its "Current Scale monthly cost of insurance rates expressed as a table that includes charge rates for future Policy Years that generally increase as the Insured's Attained Age increases are not changes to the Current Scale as described in the Changes in Policy Cost Factors section of this Policy." The Majernik Policy contains no such language. The Majernik Policy addresses changes in "cost of insurance deductions" and "adjustment in these rates," with no defined scale and no carve-out for age-based increases. And the policy itself lists examples of charges that do not change in many policy years, such as the surrender charge, which stays flat at $513 per year for the first 6 years, then begins to change after year 6. Nothing in the policy tells the policyholder whether future COI rates and deductions are projected to increase, and policyholders are not told whether the rates and deductions have changed each year until *after* the change is made and disclosed in each annual report.

39. The Policy also consistently distinguishes between "Tables" of rates and charges which are scales of rates and charges, and the rates and charges themselves. For example, the policy provides a "TABLE OF GUARANTEED MAXIMUM INSURANCE COSTS," which lists an individual's maximum "MONTHLY RATE" for each attained age, and which represents the highest COI rate the company is allowed to assess each year. The policy also provides a "TABLE OF SURRENDER CHARGES," with amounts listed per policy year. There is, by contrast, no "Table" of current or projected COI rates or deductions disclosed in the policy, and policyholders are not told whether there is any such internal table of current or projected COI rates maintained by Equitable. And the policy refers to changes in COI rates, and adjustments in COI deductions, not to changes in a (hypothetical, undisclosed) table or scale of projected COI rates.

40. Equitable's contention that both the term "cost of insurance deductions" and the term "cost of insurance rates" actually mean "cost of insurance scales" would, in any event, not

relieve it from the obligation to reduce rates when expectations materially improve. Plaintiff's endorsement states that Equitable "WILL REVIEW THE COST OF INSURANCE RATES AT LEAST EVERY FIVE YEARS AND AT THE TIME ANY CHANGE IS MADE FOR NEW ISSUES." A reasonable policyholder would understand this to impose an outer-bounds obligation on Equitable to update rates at least every five years to be based on current assumptions—regardless of whether those rates have changed.

41. The obligation for rates to be based on current cost factor assumptions is also reflected elsewhere in the policies. The COI Overcharge Class Policies require that "[u]pon request we will give you an illustration of the future benefits under this policy based upon both guaranteed and ***current*** cost factor ***assumptions***." (emphasis added). Generally speaking, an illustration is a written summary that Equitable provides policyholders that projects their policy's future anticipated costs. An illustration is, in essence, the "price tag" for a universal life insurance policy and a projection of future COI deductions and rates. As an AXA actuary testified in a prior litigation, "you figure out how much a life insurance product costs" by "[us]ing the illustration." *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 235–36 (S.D.N.Y. 2022).

42. Equitable can only comply with this obligation if it updates COI rates and deductions based on its ***current*** cost factor assumptions. If Equitable fails to adjust COI deductions and rates based on changes to its assumptions, its illustrations by definition will not be "based upon . . . ***current*** cost factor ***assumptions***." (emphasis added). This is yet another reason that the COI rates that Equitable charges must be determined based on current expectations for the enumerated cost factors: failure to do so would breach not only the COI-specific provisions, but also the illustration provision.

### C. Equitable's Mortality Expectations Have Also Improved.

43. Equitable's expectations of future mortality for the COI Overcharge Class Policies have also improved since these policies were issued. Mortality is generally the most significant component of COI deductions and rates. Beginning at least in 1941, the NAIC has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry-standard mortality tables that insurers use to calculate reserves and to set maximum permitted COI rates in UL policies. The IRS also uses the CSO tables to define what constitutes "life insurance," what constitutes a "reasonable mortality charge," and what is deductible for federal tax purposes. The CSO tables are conservative tables, which add scalars to the expected mortality.

44. The Majernik Policy uses the "1980" version of this CSO table. *See* Majernik Policy at 15 ("We base minimum cash surrender values and reserves on the 'Commissioners 1980 Standard Ordinary Male and Female Mortality Tables.'"). That table was the industry-standard table for reserves until 2001. In 2001, at the request of the NAIC, the SOA and the American Academy of Actuaries ("Academy") produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table for reserves and (b) expected mortality rates had improved significantly each year since the 1980 table was issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.[7]

45. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to

---

[7] https://actuary.org/wp-content/uploads/2025/05/Report%20on%20the%20proposed%202001%20CSO%2006-01-2001.pdf

80% of the 1980 CSO Table." The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

46. This improvement in mortality has continued. The SOA published updated CSO tables in October 2015, which showed further significant reductions in life insurance reserves compared to the 2001 CSO Mortality Table due to mortality improvements.

47. The 2001 CSO Mortality Table was generated from the 1990–1995 Basic Mortality Tables published by the SOA, which reflected the death rates observed by 21 large life insurance companies with policy anniversaries between 1990 and 1995. Basic Mortality Tables are developed to be representations of mortality rates for the period identified in the table name. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables it has published over the last few decades include:

- 1975–1980 Basic Select and Ultimate Mortality Table
- 1985–1990 Basic Select and Ultimate Mortality Tables
- 1990–1995 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

The 2001, 2008, and 2015 Valuation Basic Tables each show significant mortality improvement. The October 2015 report accompanying the 2017 CSO Table states: "The current CSO table was created in 2001 based on experience from 1990–1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee (ILEC) have shown significant improvement in the mortality rates experienced by the

industry from that underlying the 2001 CSO table development."[8]

48. This trend of improving mortality expectations has continued. In 2017, for example, the SOA published a study with recommendations for mortality improvement assumptions for insurance reserving for AG-38 (Actuarial Guideline No. 38), which covers reserving for certain universal life insurance policies, including the COI Overcharge Class Policies here. The SOA updates this study annually, and the 2017 study showed improving mortality across the board for the previous five years, with no negative figures in any published table from 2013 to 2017. And in 2019, the SOA issued a report finding that in 2018, the United States age-adjusted mortality rate realized its largest decrease since 2009, and the mortality rate as of 2018 was the lowest mortality rate in U.S. history.

49. COVID-19 did not emerge worldwide until 2020, and the increase in mortality resulting from that was (a) relatively small in historical terms, and (b) generally viewed by the industry as transitory, with insurers still projecting future mortality improvement to continue.

50. Equitable has confirmed this trend of improving mortality. Its recent financial statements note that Equitable applies a "mortality improvement assumption" to its mortality results, meaning Equitable is continuing to expect mortality to improve.

51. In short: expectations of future mortality improved and represent a substantial benefit to Equitable, which, independently of the TCJA, should have led to a further reduction in COI deductions and rates.

**D. <u>None of Equitable's Other Expectations Deteriorated, Let Alone to a Degree Sufficient to Offset the Impact of the TCJA and Mortality Improvement.</u>**

52. It is impossible for any alleged deterioration in Equitable's expectations for non-tax and non-mortality factors enumerated in the policies (e.g., expenses, persistency, investment

[8] https://www.soa.org/globalassets/assets/files/research/exp-study/research-2017-cso-report.pdf

earnings) to have offset the positive impact of the TCJA or mortality improvement. The change in corporate tax rate alone implies that, for a profitable block of universal life policies, COI rates should be reduced considerably.[9]

53. NAIC annually requires insurers to answer Interrogatory Question #7: to identify whether "there is a substantial probability that illustrations authorized by the [reporting entity] to be presented on new and existing business cannot be supported by currently anticipated experience." Under the standards of practice promulgated by the Actuarial Standards Board (and corresponding state regulations), illustrations must forecast anticipated future policy costs using COI rates that are "not more favorable" (namely the same or higher) than rates "reasonably based on actual recent historical experience."

54. Both before passage of the TCJA and thereafter, Equitable's response to Interrogatory Question #7 was "[n]o" and that "[e]merging investment, mortality, persistency and expense experience are monitored and changes to illustrations of non-guaranteed elements will be made as warranted." This confirms that (1) Equitable has continued to monitor mortality and the other relevant experience factors, and (2) Equitable concluded, in the course of those reviews, that none of the experience factors have deteriorated in such a way as to make the illustrated rates unsupportable, let alone to such a degree that it would offset the positive impact of the TCJA.

---

[9] The actuarial consulting firm Milliman Inc. issued a white paper concluding that, for new policies issued after TCJA took effect, COI rates should be set at least 8% lower than they were pre-TCJA after taking into account all of the changes to life insurer taxation made by the TCJA. The impact was highly material and could not possibly have been offset by deterioration in any other expectations.

55. Other publicly available information about the other factors enumerated in the policies also confirms that they have not deteriorated, let alone deteriorated so much as to offset the positive impact of the TCJA or mortality improvement.[10]

56. ***First***, Equitable's expectations of investment income have not deteriorated; they have improved. Ten-year Treasury rates have climbed from roughly 2.4% when the TCJA was passed to over 4.9% today, and insurers earn well in excess of Treasury rates through their sophisticated investment strategies. And in 2018, when explaining its 28% increase in operating earnings, Equitable's Chief Financial Officer explained that "[l]ower income tax expense is driven by the impact of tax reform and higher net investment income."

57. ***Second***, it is implausible that Equitable's persistency expectations could have deteriorated to such a degree as to offset improvements in tax and mortality expectations. Equitable's regulatory submissions do not disclose prevailing persistency deterioration or suggest that profitability is highly dependent on high or low lapse rates.

58. ***Third***, Equitable's expectations of future "expenses" that are not taxes could not have changed materially for the worse in recent years to offset the dramatic improvements in tax expectations. Each year the SOA publishes a Generally Recognized Expense Table ("GRET") containing a summary of expense charges reported by insurance companies to the NAIC. This table shows that the majority of expenses are incurred in the origination of the policy such as brokerage fees (labeled as acquisition costs). These costs have already been incurred on issued policies and do not feature in prospective calculations of future expectations of expenses. Furthermore, the GRET tables show little change in ongoing maintenance costs. For example, the

---

[10] Plaintiff makes these allegations from publicly available information. Equitable develops proprietary assumptions with respect to its expectations of mortality, persistency, expenses, and investment earnings, but does not disclose those to policyholders or the public.

suggested per unit maintenance cost for a directly originated policy was $60 in 2017 and $59 in 2023 as improved IT system efficiency has offset inflation.

## CLASS ACTION ALLEGATIONS

59. This action is brought by Plaintiff individually and on behalf of a class—the COI Overcharge Class—pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The COI Overcharge Class consists of:

> All current and former owners of universal life (including variable universal life) insurance policies issued or insured by Equitable Financial Life Insurance Company or its predecessors in interest that state that cost of insurance deductions or rates (or any changes in deductions or rates) will be based on or determined according to future expectations that include taxes and/or mortality.

The COI Overcharge Class does not include Defendant, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing, or any policies within the settlement classes in *Brach Family Foundation, Inc. et al. v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 740 (JMF) (S.D.N.Y.).

60. Plaintiff reserves the right to seek certification of subclasses, or alternative classes, by original issuing company, product, state of issue, or dates of ownership.

61. The COI Overcharge Class consists of hundreds or thousands of consumers of life insurance and is thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Equitable.

62. The claims asserted by Plaintiff are typical of the claims of the COI Overcharge Class.

63. Plaintiff will fairly and adequately protect the interests of the class and does not have any interests antagonistic to those of the other members of the COI Overcharge Class.

64. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

65. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any classes certified in this action.

66. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the COI Overcharge Class predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether Equitable breached the policy provisions by ignoring the impact of the TCJA each time it changed COI deductions or rates;

(c) whether Equitable breached the policy provisions by ignoring improved mortality each time it changed COI deductions or rates; and

(d) whether Plaintiff and members of the COI Overcharge Class are entitled to receive damages as a result of the unlawful conduct by Defendant as alleged herein and the methodology for calculating those damages.

67. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims means that few, if any, class members could afford to seek legal redress individually for the wrongs that Equitable committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when Equitable's liability has been adjudicated, claims of all COI Overcharge Class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and Equitable's violations of law will continue without redress while Equitable continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

68. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff and the COI Overcharge Class.

69. The Equitable policies are binding and enforceable contracts.

70. Equitable has repeatedly breached its contracts with Plaintiff and the COI Overcharge Class by applying, adjusting, and changing COI rates and COI deductions that were not, and are not, based on changes in future expectations as to taxes and mortality. The damages of Plaintiff and the COI Overcharge Class include, but are not limited to, the excess COI charges that Equitable deducted by not changing or adjusting COI deductions and rates based on the factors set forth in the COI Overcharge Class Policies.

71. Equitable's failures also breach the covenant of good faith and fair dealing that is implied by law in all contracts.

72. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Equitable's conduct as set forth herein.

73. As a direct and proximate cause of Equitable's material breaches of the policies, Plaintiff and the COI Overcharge Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the class members pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the class compensatory damages;

3. Awarding Plaintiff and the class pre-judgment and post-judgment interest, as well as any costs and attorneys' fees allowed by law; and

4. Awarding Plaintiff and the class such other relief as this Court may deem just and proper under the circumstances, including without limitation reinstatement and other equitable relief for policies that lapsed or were surrendered after Equitable's breaches.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.

Dated: October 30, 2026

Respectfully submitted,

*/s/ Seth Ard*

Seth Ard
Ryan C. Kirkpatrick

Simone Seiver (*pro hac vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
Telephone: 212-336-8330
Facsimile: 212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
sseiver@susmangodfrey.com

Steven G. Sklaver (*pro hac vice*)
Glenn C. Bridgman (*pro hac vice*)
Halley Josephs
Kimberly C. Page (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: 310-789-3100
Facsimile: 310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
hjosephs@susmangodfrey.com
kpage@susmangodfrey.com

*Attorneys for Plaintiff*